FILED
2025 Aug-29 PM 12:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

JANELL LUNA,                               )
                                           )
       Plaintiff,                   )
                                           )
vs.                                        )   Case No.  5:24-cv-00810-HNJ
                                           )
SOCIAL SECURITY                            )
ADMINISTRATION, COMMISSIONER,              )
                                           )
       Defendant.                   )

## MEMORANDUM OPINION

Plaintiff Janell Luna seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability, disability insurance, and supplemental security income benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 9).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at §§ 404.1520(d), 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§

404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925.  That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) (citing 20 C.F.R. § 416.920; *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997)) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.").

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* §§

404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g).  If the claimant cannot perform other work, the evaluator will find the claimant disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).  Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citing 42 U.S.C. § 405(g)).  Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.  *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . .  Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 103 (citations omitted).  Therefore, substantial evidence exists even if the evidence

preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Luna protectively filed an application for a period of disability and disability insurance benefits, alleging disability as of June 1, 2018. She later filed an application for supplemental security income benefits, alleging disability as of August 5, 2021. (Tr. 247-59). However, due to the disposition of a previous claim, the Commissioner amended the alleged onset date to August 26, 2020. (Tr. 10, 75, 90, 325).

On May 12, 2022, the Commissioner denied Luna's claims. (Tr. 110-19). On May 20, 2022, Luna requested reconsideration of the Commissioner's decision (Tr. 120-22). The Commissioner reviewed Luna's claim yet, on June 15, 2023, the Commissioner determined the previous denials were proper under the law. (Tr. 134-41). On July 5, 2023, Luna filed a request for a hearing. (Tr. 143-44). On November 7, 2023, the ALJ held a hearing. (Tr. 32-55). On January 11, 2024, the ALJ issued an opinion denying Luna's claims. (Tr. 7-23).

Applying the five-step sequential process, the ALJ found at step one that Luna did not engage in substantial gainful activity after August 26, 2020, her amended alleged disability onset date. (Tr. 13). At step two, the ALJ found Luna manifested the severe impairments of neuropathy and bilateral carpal tunnel syndrome. (*Id.*). At step three, the ALJ found Luna's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (Tr. 16).

Next, the ALJ found Luna exhibited the residual functional capacity ("RFC") to perform sedentary work, with the following additional limitations:

> frequent postural maneuvers; no climbing of ropes, ladders, or scaffolds; avoid dangerous moving unguarded machinery and unprotected heights; must be afforded the option to sit or stand during the workday, one to two minutes at a time while remaining on task; and she is limited to frequent handling and fingering with the bilateral upper extremities.

(*Id.*).

At step four, the ALJ determined Luna retained the ability to perform her past relevant work as a bookkeeper and accounting clerk.  (Tr. 22).  Accordingly, the ALJ determined Luna has not suffered a disability, as defined by the Social Security Act, since August 26, 2020.  (*Id.*).

Luna filed a request for review of the ALJ's opinion before the Appeals Council. (Tr. 245-46).  On April 16, 2024, the Appeals Council denied Luna's request for review, making the ALJ's decision the Commissioner's final decision.  (Tr. 1-3).  Luna filed her complaint with this court on June 19, 2024.  (Doc. 1).

## ANALYSIS

In this appeal, Luna argues the ALJ improperly evaluated the medical opinion evidence, improperly determined her RFC, and improperly evaluated her subjective symptoms.  For the reasons discussed below, the undersigned concludes Luna's contentions do not warrant reversal.

## I.    The ALJ Properly Considered the Medical Opinion Evidence.

Luna first challenges that the ALJ improperly considered medical opinion evidence from Dr. Vytautas Pukis, Luna's primary care physician.

Social Security regulations state that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  The ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion.  *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors.  *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).  Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources[,] the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations.  *Id.*  §§

404.1520c(c)(3)-(5), 416.920c(c)(3)-(5).  The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file.  *Id.* §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v).  The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.* §§ 404.1520c(c)(5), 416.920c(c)(5).

On May 2, 2022, Dr. Pukis completed a form at Luna's request.  He stated he treated Luna for narcolepsy, polyneuropathy, and anxiety between March 23, 2022, and April 27, 2022.  He described Luna's prognosis as "poor (can't work)," and he checked a box indicating Luna was "[u]nable to work at this time."  He expected Luna's impairments to last at least 12 months.  He commented that Luna experienced loss of appetite, palpitations, dizziness, nausea, vomiting, and panic attacks resulting in hyperventilation.  She could not concentrate on, or prioritize, tasks. (Tr. 860-61).[2]

---

[2] Dr. Pukis also included general descriptions of the symptoms patients with polyneuropathy, narcolepsy, and anxiety may experience:

> Polyneuropathy affects several nerves in different parts of body at same time. Symptoms include tingling, numbness, pins/needles, difficulty using extremities, increased pain (burning, stabbing, freezing or shooting pains), sleep problems (d/t nighttime pain), inability to feel pain, or extreme sensitivity to touch.

> Narcolepsy without cataplexy is a neurological condition affecting many aspects of functioning, causes intense & overpowering sleepiness.  Can occur frequently throughout day.

Dr. Pukis's May 2022 opinion did not persuade the ALJ, as the doctor's objective treatment examinations produced "essentially normal" results, as had the consultative examinations by other physicians.  In addition, the ALJ reasoned:

> Dr. Pukis states the claimant "can't work,"[3] yet finds no difficulty in any of the listed items that might require accommodation . . . .  As support for his opinion, he lists all of the subjective statements of the claimant about her symptoms . . ., in particular those she most recently report[ed] on March 23, 2022 . . ., while the objective exam . . . was again normal, other than "+paraspinal muscle tenderness" that he includes present at every visit.

(Tr. 21).

Dr. Pukis continued to treat Luna through early May 2023, and on November 6, 2023, he completed a Clinical Assessment of Pain form.  He indicated Luna experienced pain that would distract her from adequately performing daily activities or work.  Physical activity such as walking, standing, sitting, bending, stooping, or moving extremities would greatly increase her pain, causing distraction from or total

---

> Anxiety mental disorder characterized by feelings so strong that interfere with one's daily activities.  Symptoms can include stress out of proportion to impact of events, inability to set aside worry, restlessness, easily fatigued, difficulty concentration, irritability and sleep problems.  Fear at times can be so bad [that it] causes chest pain, can get worse over time.  Can make it nearly impossible to stop focusing on things you don't want to think about.

(Tr. 861).  However, he did not state Luna experienced all these symptoms or specify which symptoms actually affected her.  Therefore, his descriptions do not provide appreciable evidentiary support for the existence of disabling functional limitations.

[3] Dr. Pukis's statement about Luna's inability to work does not mandate a finding of disability, as the determination of disability "is reserved to [an] administrative law judge acting on behalf of the Commissioner."  *Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338-39 (11th Cir. 2021).

abandonment of tasks.  The side effects of Luna's prescribed medications could severely limit her effectiveness due to distraction, inattention, and drowsiness.  (Tr. 904).

On the same date, Dr. Pukis completed a form entitled Medical Questionnaire Regarding Limitations.  He indicated Luna's medical conditions would preclude her ability to maintain concentration, persistence, and pace for two-hour periods; preclude her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances on a continuing basis; and require her to lie down during the day.  The conditions validating those limitations included chronic pain, neuropathy, narcolepsy, and chronic fatigue syndrome.  Dr. Pukis assessed Luna could sit for a total of three hours and stand/walk for a total of one hour during an eight-hour workday.  She would miss more than four days from work each month because of her impairments and treatment.  Dr. Pukis stated Luna "has multiple chronic medical issues, including chronic pain, anxiety, [and] chronic fatigue, that will significantly impact her ability to be productive at work."  He opined her limitations related back to the time frame of August 2020.  (Tr. 905).

Dr. Pukis's opinions on these forms also did not persuade the ALJ, for the following reasons:

> There are no treatment records of the claimant following up with Dr. Pukis in more than six months at the time he completed these forms.  The circle-type multiple choice answers on the pain form are based on subjective statements of the claimant, noting "the extent to which the patient expresses the present [sic] of pain and requests medication for relief" is included at the top of the form as a consideration.  The assessment of pain is not consistent with consultative physical exams in

2022 or 2023 or with the only Gabapentin use reported most recently during 2023, and not consistent with daily activities and unimpaired exertional functioning the claimant reports in the record, including to those consultative examiners. The functional assessment includes symptoms preclude [*sic*] concentrating for two-hour periods, which contrasts sharply with the unimpaired functioning in that area that both the claimant and her mother report in daily activities questionnaires. Even the ability to sit and stand/walk for only four hours total during an eight-hour workday is not consistent with the good strength, reflex, mobility, and ranges [of] motions on objective exams as well as the claimant's reports at consultative exam and in daily activities questionnaire of no[] limits exertionally, which is corroborated by her mother, who the claimant lives with, in a daily activities questionnaire she completed. Furthermore, some of the diagnoses Dr. Pukis lists as the basis for his opinions (e.g., chronic fatigue syndrome, narcolepsy) are not validated by objective testing or diagnosed or conditions of concern by consultative examiners.

(Tr. 21).

Luna raises several alleged challenges to the ALJ's evaluation of Dr. Pukis's opinions. First, she asserts "the ALJ failed to consider the supportive explanation that the treating doctor provided for his opinions." (Doc. 12, at 4). Specifically, Luna asserts Dr. Pukis based his opinions on "clinical evidence of Ms. Luna's polyneuropathy with tingling, numbness, pains[*sic*: 'pins']/needles, difficulties using her extremities, increased pain, sleep problems, and sensitivity to touch secondary to her polyneuropathy as well as findings of intense and overpowering sleepiness due to narcolepsy," and the ALJ "failed to explain why the detailed supportive explanation from the treating doctor did not support his opinions." (*Id.* at 4-5).

However, the record does not support Luna's assertion. Dr. Pukis's May 2022 assessment includes general descriptions of the symptoms a person experiencing

11

polyneuropathy, narcolepsy, or anxiety might display, but Dr. Pukis did not specify which of the symptoms Luna actually experienced. (*See supra*, note 3). Accordingly, the ALJ did not err in failing to separately address each of the symptoms Dr. Pukis described, and she did not ignore any supporting explanations for Dr. Pukis's opinions.

Second, Luna argues the record does not support the ALJ's characterization of Dr. Pukis's treatment examinations as producing "essentially normal" results. However, Luna does not point to any of Dr. Pukis's treatment notes in support of that argument, and the court's review of Dr. Pukis's notes reflects consistency with the ALJ's statements. On January 7, 2021, June 25, 2021, July 28, 2021, March 23, 2022, April 27, 2022, July 27, 2022, October 26, 2022, January 26, 2023, and May 4, 2023, Luna complained to Dr. Pukis about numbness and swelling in her feet, tingling in her hands, fatigue, and sleep disturbance, yet the neurological clinical examination produced no abnormal findings. (Tr. 770-77, 866-91). Dr. Pukis prescribed Neurontin. (*Id.*). Moreover, as the ALJ observes, most of Dr. Pukis's diagnoses and assessments relied upon Luna's subjective complaints of symptoms, and more than six months elapsed between Luna's last visit to Dr. Pukis and Dr. Pukis's assessment. (Tr. 21).

Rather, the records Luna cites as contradicting the ALJ's characterization of "essentially normal" treatment records hail from other treatment providers, not from Dr. Pukis. For example, on August 31, 2020, Luna reported to a pulmonologist that she experienced numbness in her feet and hands, fatigue and all-day sleepiness, and "multiple little complaints here and there." (Tr. 726). A March 16, 2021, EMG/nerve

conduction study ordered by Rehabilitation and Neurological Services revealed diffuse sensorimotor peripheral polyneuropathy with both axonal and demyelinating features, yet no evidence of a right lumbar radiculopathy or any other focal nerve entrapment in the right lower limb. (Tr. 745). An x-ray ordered the same date revealed moderate degenerative changes in the cervical spine and mild degenerative changes in the lumbar spine. (Tr. 748).

Luna reported to a nurse practitioner at Rehabilitation and Neurological Services on March 16, 2021, April 7, 2021, and April 21, 2021, that she experienced neuropathy with numbness and tingling in her feet and hands. (Tr. 740, 745, 748, 754-55). As Luna points out, on those dates, clinical examinations revealed reduced muscle weakness at level 4/5 in the left and right abductor pollicis brevis, and in the bilateral abductor digiti minimi (ADM); positive Phalen's test bilaterally; decreased reflexes in all muscles other than the quadriceps; impaired sensation upon touch; a wide-based gait; trophic changes in the bilateral lower extremities; and tender points in the right and left cervical regions, right lateral epicondyle region, right and left lumbar regions, and right and left trapezius regions. (Tr. 742, 749, 755). However, those clinical examinations also reflected no downward drift, normal muscle bulk, full muscle strength in all extremities other than those aforementioned, absent Tinel's sign bilaterally, normal finger-to-nose and heel-to-shin testing, normal rate of gait, appropriate tandem gait, normal ability to walk and stand on toes and heels, negative Romberg signs, and good capillary refill. (*Id.*). Though these records present some neurological findings supporting Luna's complaints of

numbness and tingling in her feet and hands, they do not directly contradict the ALJ's decision to find unpersuasive Dr. Pukis's assessments about the extent of Luna's impairments.

Moreover, as the ALJ observed, the consultative examinations by other physicians also reflect essentially normal findings.

Dr. Rajappa Ekambaram conducted a consultative examination on April 1, 2022. Luna reported bilateral hand pain and memory and cognitive problems. The examination of Luna's central nervous system revealed normal speech, memory, and orientation; normal reflexes; no muscle wasting; normal coordination of movement; normal joint sense and vibration sense; normal Romberg signs; normal sensory functions; intact autonomic nervous system; and normal cranial nerves. Luna displayed normal range of motion in all joints. Luna did not need an assistive device, as she exhibited normal gait without an assistive device. Luna also exhibited normal musculoskeletal, neurological, and nervous functions, along with good hand grip and dexterity. Dr. Ekambaram opined Luna experienced no memory loss or cognitive disability. (Tr. 850-58).

Dr. Daniel Krautter conducted a consultative examination on May 13, 2023. Luna reported experiencing level-nine neuropathic pain and numbness in her feet for the past three years. She reported nothing improved the pain, including her Neurontin prescription. She experienced no difficulty in sitting, standing, or walking. She can perform all activities of daily living, including cooking, meal preparation, personal care,

housekeeping, laundering clothes, shopping, banking, and driving. During the physical examination, Luna exhibited full muscle strength, full grip strength, good dexterity, intact cranial nerves, negative Romberg's sign, mild sensory loss in lower extremities to soft touch, normal reflexes, normal range of motion in all joints, and mildly antalgic gait favoring her right leg. (Tr. 895-902).

These findings support the ALJ's conclusion that the consultative examinations produced "essentially normal" results.

Third, Luna argues that the ALJ erroneously assessed the consistency of Dr. Pukis's opinion with her daily living activities. The Eleventh Circuit permits an ALJ's rejection of a medical opinion in part when the opinion contradicts pertinent evidence of daily activities. *See e.g., Carpenter v. Comm'r of Soc. Sec.,* 614 F. App'x 482, 489 (11th Cir. 2015) (ruling the ALJ possessed good cause to discount treating physician's opinion partly because it "was somewhat at odds" with the plaintiff's description of his daily activities reported to another physician); *Moore,* 405 F.3d at 1212 (finding ALJ did not err in discounting treating chiropractor's opinion because it "failed to account for [claimant's] diverse daily activities" ); *Tisdale v. Soc. Sec. Admin., Comm'r,* 806 F. App'x 704, 710 (11th Cir. 2020) (finding ALJ entitled to reject physician's opinion that claimant would "likely require a sheltered work setting" where claimant's descriptions of her own daily activities did not support such a limitation); *see also id.* ("As we have said before, the ALJ 'may reject any medical opinion if the evidence supports a contrary finding.'" (quoting *Sharfarz v. Bowen,* 825 F.2d 278, 280 (11th Cir. 1987))).

Though numerous courts have cautioned that "'participation in everyday activities of short duration' does not disqualify a claimant from disability," as "[i]t is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances," an ALJ should rely upon evidence of a claimant's daily activities as a basis to discount "a claimant's testimony when [his or] her daily activities demonstrate a higher level of functioning than her alleged disabling symptoms would allow." *Love v. Colvin*, No. 6:15-CV-338-WMA, 2016 WL 741974, at *5 (N.D. Ala. Feb. 24, 2016) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997)) (internal quotation marks and citations omitted).

The ALJ did not erroneously equate Luna's ability to perform minimal daily activities with an ability to work on a full-time basis. Rather, she considered the inconsistency of Luna's reported activities with Dr. Pukis's opinions as one factor in deciding not to credit Dr. Pukis's opinions. That determination found support both in applicable law and in the record evidence. *See Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 663 (11th Cir. 2010) ("Although a claimant's admission that she participates in daily activities for short durations does not necessarily disqualify the claimant from disability . . ., that does not mean it is improper for the ALJ to consider a claimant's daily activities at all.") (citations omitted); 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (stating that an ALJ should consider a claimant's daily activities in evaluating the limiting effects of his impairments).

On an August 28, 2021, Function Report, Luna stated she experienced peripheral

neuropathy.  Her daily activities included taking her dog out and vomiting.  She sleeps erratically, but she experiences no problems performing personal care tasks.  She prepares her own meals daily, but she does not perform yard work.  She goes outside three times each day.  She inconsistently stated she drives a car when she goes out, but then also stated she does not drive due to numbness in her feet and tingling in her hands.  She shops in stores, handles money, watches television eight hours a day, and talks on the phone weekly.  She does not need reminders or assistance going places, and she does not experience problems getting along with others.  Even so, her social activity has diminished due to fatigue.

She checked a box indicating her conditions affect her memory, but she did not check boxes indicating her conditions affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, complete tasks, concentrate, understand, follow instructions, use her hands, or get along with others.  She can pay attention for two hours at a time, and she can finish tasks she begins.  She has never lost a job because of an inability to get along with others, and she can handle stress and changes in routine.  (Tr. 336-43).

Luna's mother completed a Function Report on January 26, 2022.  She stated Luna makes breakfast and takes care of their dog, and her illnesses do not affect her sleep.  Luna can perform all personal care tasks, though she needs reminders to take her medications.  She prepares her own meals for approximately a half-hour each day, and she can clean and do laundry for an hour without assistance or encouragement.

Luna rides in a car, but she does not drive, and she does not go out alone. Luna can shop in stores for groceries, and she can handle money. Luna's daily hobbies and interests include watching television. Luna spends time with others in person at birthday parties or family gatherings, but she does not attend any social activities on a regular basis. She does not need reminders to go places, but she does need someone to accompany her. She experiences no problems getting along with others.

Luna's mother checked a box indicating Luna's illnesses affect her memory, but she did not check boxes indicating the illnesses affect Luna's ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, complete tasks, concentrate, understand, follow instructions, use her hands, or get along with others. Luna's mother wrote "n/a" in response to an inquiry how far Luna could walk before needing to rest. She stated Luna could pay attention all day, finish what she starts, follow instructions, get along with authority figures, and handle stress and changes in routine. Luna's condition sometimes causes her to fall. Luna does not take any medication for her illnesses. (Tr. 354-61).

Luna completed another Function Report on September 12, 2022. She stated she experiences neuropathy in her feet and fingers. Her activities include doing dishes, making breakfast, and walking and feeding her pet. She sleeps more than she did before her illness. She can perform personal care tasks, and she does not need reminders to care for herself or take medicine. She makes her own meals daily, and she can vacuum and clean for an hour a time without help or encouragement. She can ride in a car, but

18

she cannot drive. She shops in stores for clothes, and she can handle money. She did not report any hobbies, but she spends time with others in person. She does not need reminders to go places, but she does need someone to accompany her. She gets along with others.

She did not check any boxes indicating her condition affects any functional abilities, including her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, use her hands, or get along with others. She can walk a half-mile before needing to rest. She finishes what she starts, and she does well following instructions and interacting with authority figures. She can manage stress and changes in routine, and she does not use an assistive device to ambulate. (Tr. 371-78).

In addition, as discussed, Luna reported to Dr. Krautter during the December 31, 2023, consultative examination that she experienced no difficulty in sitting, standing, or walking, and she can perform all activities of daily living, including cooking, meal preparation, personal care, housekeeping, laundry, shopping, banking, and driving.

All of these records support the ALJ's conclusion that Dr. Pukis's assessment of disabling pain symptoms did not comport with the daily activities Luna and her mother reported in the Function Reports and to the consultative examiner.

Finally, Luna argues "the ALJ's decision does not comply with the requirement that the ALJ must meaningfully '*articulate*' how she considered, at the very least, the consistency and supportability of medical opinions from the treating . . . doctor." (Doc.

12, at 6 (emphasis in original)). The record does not support that argument. To the contrary, as discussed, the ALJ assessed the consistency of Dr. Pukis's opinions with Dr. Pukis's own medical findings, the findings of the consultative examiners, other medical records, and Luna's reported daily activities. She also considered the lack of objective testing or diagnoses for Luna's alleged chronic fatigue syndrome and narcolepsy. The ALJ considered that Dr. Pukis primarily based his assessments on Luna's subjective complaints, rather than on objective findings, and Dr. Pukis had not treated Luna for more than six months prior to the consultative examination. The "articulation requirement is met so long as the evaluation addresses the substance of the factors, regardless of the specific language used in the evaluation." *Rivera v. Kijakazi*, No. 6:21-cv-93-AAS, 2022 WL 2965883, *4 (M.D. Fla. July 27, 2022) (citation omitted). Given the evidence reviewed previously, the undersigned finds the ALJ stated her supportability and consistency determinations with sufficient particularity.

In summary, for all the foregoing reasons, the court concludes the ALJ did not err in considering Dr. Pukis's opinions.

## II.    The ALJ Properly Assessed Luna's RFC.

As previously discussed, at step four of the sequential analysis the ALJ formulates a claimant's RFC by assessing the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4). The claimant's RFC represents "the most [the claimant] can still do despite [their] limitations." *Id.* at §§ 404.1545(a)(1), 416.945(a)(1). Assessing a claimant's RFC lies

within the exclusive province of the ALJ.  *See id.* at §§ 404.1527(d)(2), 416.927(d)(2) ("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); *id.* at §§ 404.1546(c), 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ."); *Del Rio v. Berryhill*, No. 3:16-CV-00489-RFC, 2017 WL 2656273, at *8 (W.D. Tex. June 20, 2017) ("The ALJ has the sole responsibility of determining Plaintiff's RFC . . . .").

Luna argues the ALJ's RFC finding lacks substantial evidentiary support, as the ALJ "rejected every medical opinion in the record regarding . . . Luna's physical functioning." (Doc. 12, at 7).  As the regulations specifically vest the ALJ with authority to assess RFC, the mere act of assessing an RFC clearly does not cause an ALJ to exceed applicable authority and impermissibly "play doctor."  *See Castle v. Colvin*, 557 F. App'x 849, 853 (11th Cir. 2014) ("[T]he ALJ did not 'play doctor' in assessing Mr. Castle's RFC, but instead properly carried out his regulatory role as an adjudicator responsible for assessing Mr. Castle's RFC.").  The question remains whether the ALJ drew permissible conclusions from the medical evidence.

Generally, an ALJ's duty to develop the record does not require the retrieval of additional medical evidence "'as long as the record contains sufficient evidence for the [ALJ] to make an informed decision.'"  *Id.* (quoting *Ingram v. Comm'r of Soc. Sec. Admin.,*

496 F.3d 1253, 1269 (11th Cir. 2007)); *see also Rice v. Kijakazi*, No. 4:20-CV-01414-RDP, 2021 WL 3473219, at *6 (N.D. Ala. Aug. 6, 2021) (citations omitted) ("An ALJ does not assume the role of a doctor in assessing a claimant's RFC and an ALJ is not required to base his or her RFC finding on a doctor's opinion."); 20 C.F.R. §§ 404.1519a(b), 416.919a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim.").

In a persuasive unpublished opinion, the Eleventh Circuit rejected the argument that an ALJ may never "interpret raw data in a medical record." *Castle,* 557 F. App'x at 854. Rather, when "'medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment.'" *Id.* (quoting *Manso-Pizarro v. Sec'y of Health & Human Servs.,* 76 F.3d 15, 17 (1st Cir. 1996)); *cf. Pupo v. Comm'r, Soc. Sec. Admin.,* 17 F.4th 1054, 1065 (11th Cir. 2021) ("While medical opinion evidence as to a claimant's physical abilities and limitations is not required in every case, it is particularly helpful in a complicated medical case like Pupo's, in which the claimant has many longstanding physical and mental ailments.").

Therefore, the court must assess, based upon the particular facts of this case, whether the ALJ's RFC finding – absent a physician's functional assessment or any additional information from Luna's physicians – comported with applicable law and enjoyed substantial evidentiary support. *Whisby v. Colvin*, No. 5:13-CV-360-MTT, 2015

WL 150188, at *3 (M.D. Ga. Jan. 12, 2015) (citations omitted) ("There is no bright line between an ALJ's 'playing doctor,' which is not permissible, and an ALJ's making commonsense decisions, which is permissible. . . .   Determining where to draw the line between permissible and impermissible ALJ decision-making requires a fact-intensive review . . . .").

As Luna points out, pursuant to Social Security Ruling 96-8p, "the ALJ's residual functional capacity assessment must include 'a narrative discussion describing how the evidence supports each conclusion' and 'cit[e] specific medical facts . . . and nonmedical evidence.'" *Harvey v. Soc. Sec. Admin., Comm'r*, No. 22-10281, 2022 WL 17175649, at *2 (11th Cir. Nov. 23, 2022) (alterations in original) (citing SSR 96-8p, 61 Fed. Reg. at 34,478).   However, the ALJ does not need to enumerate every piece of evidence or function used in her determination, but rather must simply portray consideration of the claimant's medical conditions in totality.  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009).

In the case at bar, the ALJ's administrative opinion demonstrates she considered the totality of Luna's medical conditions.  The ALJ discussed the medical records addressing Luna's alleged hand tingling, including reports of independent self-care activities, objective studies showing no more than mild impairments, and lack of aggressive treatment or reports of limited use of her hands.  The ALJ also discussed the medical records addressing Luna's alleged peripheral neuropathy in her bilateral lower extremities, including clinical findings of good range of motion, good muscle strength,

only mildly diminished reflexes, and good ambulation; lack of sensory findings on

electrodiagnostic studies; and lack of consistent medical care. (Tr. 18-19). In summary,

the ALJ considered

> the conservative course of care, no records of making charity care
> application with the local hospital for access to health care, the good
> objective findings on exams, the denial of symptoms and/or lack of
> complaints when seen for care, the independence with and the daily
> activities reported by the claimant (and corroborated by a third party),
> reports of unimpaired exertionals to the consultative examiner, visits up[]
> to six months apart with treating sources, the results of diagnostic imaging
> and studies (i.e., mild/minimal carpal tunnel syndrome bilaterally; no
> cervical or lumbar radiculopathy; no spinal cord or nerve root
> compromise; no identified significant spinal stenosis or disk
> protrusion/herniation), and the [medical opinions previously discussed],
> the undersigned finds the claimant's symptoms and limitations are not of
> the frequency, duration, and/or severity to limit her greater than in the
> above finding.

(Tr. 19-20). Moreover, as discussed more fully in the following section, substantial

evidence supported the ALJ's findings regarding Luna's subjective complaints.

In summary, the ALJ did not err in assessing Luna's RFC without specific

medical findings as to the extent of Luna's impairments.

## III.    The ALJ Properly Evaluated Luna's Subjective Symptoms.

Luna next argues the ALJ improperly evaluated her subjective symptoms. For

the following reasons, the court disagrees.

> A three-part "pain standard" applies when a claimant attempts to establish
> disability through her own testimony of pain or other subjective
> symptoms. *Wilson*[ *v. Barnhart*], 284 F.3d [1219,] 1225[ (11th Cir. 2002)].
> The pain standard requires evidence of an underlying medical condition
> and either objective medical evidence that confirms the severity of the
> alleged pain arising from that condition or a showing that the objectively

determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11th Cir. 2021). A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).

Social Security Ruling ("SSR") 16-3p mandates the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, *7 (Mar. 16, 2016). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the

ALJ "must articulate explicit and adequate reasons for doing so.").

Luna testified during the November 7, 2023, administrative hearing that she experiences neuropathy pain in both feet that feels like "a bunch of little pins tapping [her] feet all day." Her feet do not swell, but they do tingle and feel numb, causing her to fear walking or entering her vehicle. Her fingers feel numb due to carpal tunnel syndrome in both wrists, and she experiences difficulty moving or using her hands to open jars. Her feet bother her every day, but her hands do not bother her every day.

She feels pain in her lower back that feels like needles poking her back. She also feels neck pain when she moves her head or sleeps with a pillow. She rated her overall pain level at a seven out of ten. The pain causes difficulty with concentrating or focusing on tasks. When she sits at a computer, her feet begin to throb, then she focuses more on her feet than on the task before her. Elevating her feet alleviates the pain. Luna estimated she could sit in a flat back chair with her feet down for a couple of hours before her feet would begin throbbing. She could stand and walk for a couple of hours at a time. Indeed, she walks her dog around her back yard "a few times for like an hour just to keep [her] feet from being numb." She can lift up to 20 pounds.

She suffers from a neurocognitive disorder that causes short-term memory deficits. She writes things down so she can remember them. Her narcolepsy affects her feet and fingers, and she sleeps to avoid the pain, but she does not fall asleep mid-task. She does not experience restful sleep because she arises at least three times a night to use the bathroom. Her foot pain sometimes affects her sleep.

Her medications do not cause adverse side effects, but she experiences occasional dizzy spells. Approximately once a week, she falls while walking because her feet feel numb and swollen. She experiences chronic fatigue, and she desires to return to sleep after being awake only a short time. She attempts to sit most of the day, but when her begin to feet feel numb, she must lie down and elevate them. Sometimes she needs to lie down for four hours a day. She believes the numbness in her feet has worsened over the past few years. She feels anxiety and frustration because she cannot do things she formerly could do. However, she does not experience panic attacks.

Because of her symptoms, she cannot drive, except to the grocery store across the street. She spends her days using the computer to look for jobs, and to check emails and social media. She also performs housework tasks including vacuuming, dusting, dishes, and making meals. (Tr. 43-50).

The ALJ considered Luna's hearing testimony as well as the symptoms and limitations included in the Function Reports discussed previously. Though the ALJ found Luna's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," she concluded Luna's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 18). Despite Luna's impairments, the ALJ concluded she could perform a limited range of sedentary work. (Tr. 16). In so finding, the ALJ properly applied the Eleventh Circuit pain standard.

Moreover, the ALJ adequately articulated the reasons for her finding. Specifically, the ALJ considered the entirety of the medical record,

> including the conservative course of care, no records of making charity care application with the local hospital for access to health care, the good objective findings on exams, the denial of symptoms and/or lack of complaints when seen for care, the independence with and the daily activities reported by the claimant (and corroborated by a third party), reports of unimpaired exertionals to the consultative examiner, visits up[] to six months apart with treating sources, the results of diagnostic imaging and studies (i.e., mild/minimal carpal tunnel syndrome bilaterally; no cervical or lumbar radiculopathy; no spinal cord or nerve root compromise; no identified significant spinal stenosis or disk protrusion/herniation), and the [medical opinions].

(Tr. 19-20). Based on that evidence, the ALJ found Luna's "symptoms and limitations are not of the frequency, duration, and/or severity to limit her greater than in the above [RFC] finding." (*Id.* 20).

That finding enjoyed substantial evidentiary support.

As previously discussed, Dr. Pukis's treatment records reflected mostly normal clinical findings, despite Luna's subjective complaints, and the ALJ properly considered Dr. Pulis's findings. (Tr. 770-77, 866-91). Though other clinical examinations at Rehabilitation and Neurological Services revealed some neurological symptoms, they also reflected Luna retained abilities consistent with the ALJ's RFC finding. (Tr. 740, 745, 748, 754-55). The consultative examiners reported mostly normal clinical findings, thereby supporting the ALJ's assessment. (Tr. 850-58, 895-902). Objective imaging from August 2020 and March 2021 revealed no more than mild to moderate impairments. (Tr. 745, 748).

As discussed, Social Security regulations permit an ALJ to consider a claimant's daily activities when assessing the report of subjective symptoms vis-à-vis the ability to work, and substantial evidence supported the ALJ's consideration of Luna's daily activities. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).

Luna argues the ALJ erred by rejecting her subjective complaints "'solely because the available objective medical evidence does not substantiate [her] statements.'" (Doc. 12, at 10 (quoting 20 C.F.R. §§ 404.1529(c)(2) & 416.929(c)(2)). However, the ALJ did not reject Luna's subjective complaints solely for that reason. The ALJ also relied upon an assessment of other factors the regulations endorse, including the consistency of Luna's subjective complaints with her daily activities, the treatment she received, and the medical opinion evidence. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3). As the Eleventh Circuit has recognized, "rejecting a claimant's statements only because they are not corroborated by the medical evidence 'is a very different circumstance from when the claimant's statements are *inconsistent* with the medical or other evidence of record.'" *Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1278 n.16 (11th Cir.), *cert. denied sub nom. Raper v. O'Malley*, 145 S. Ct. 984, 220 L. Ed. 2d 362 (2024)) (citing *Yanes v. Comm'r, Soc. Sec. Admin.*, No. 20-14233, 2021 WL 2982084, at *7 n.14 (11th Cir. July 15, 2021) (per curiam)). Indeed, "ALJs *must* evaluate a claimant's statements 'in relation to' the available evidence and 'consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence.'" *Id.* (emphasis added) (citing 20 C.F.R. § 404.1529(c)(4)).

Luna also argues the record does not support the ALJ's reliance on Luna's self-reported activities in failing to fully credit her subjective complaints.  Specifically, the ALJ stated:

> The claimant denies impairments physically and reports activities and abilities that are consistent with and support the above [RFC] finding. Specifically, during the period she alleges to be disabled, the claimant repeatedly indicates her conditions do not affect her physically, including reporting she can pay attention for two hours at a time, which is inconsistent with physical symptoms of the severity [to] interfere with concentration.  She also repeatedly reports her conditions do not affect her ability to sit, stand, walk, lift, squat, kneel, bend, reach, use her hands, or climb stairs.  She reports the ability to walk one-half mile at a time, she prepares meals daily, she shops in stores, she cleans/vacuums one hour at a time, and she is independent with dressing, bathing, shaving, and hair care.

(Tr. 19).

To support those conclusions, the ALJ relied upon Luna's August 28, 2021, and September 12, 2022, Function Reports.  (*Id.* at 19, 336-43, 371-78).  Luna acknowledges she did not check boxes indicating she suffered impairments in the listed functional areas (*See* Tr. 341, 376), yet she asserts "it is unclear if she understood the reports and she gave detailed sworn testimony that did detail such limitations."  (Doc. 12, at 10). However, Luna points to no evidence calling into question her ability to understand the Function Report form, and the record reflects Luna graduated from high school, did not receive special education services, can adequately read and write, and worked as a bookkeeper, all of which support a cognitive ability to understand written forms.  (Tr. 331).  Moreover, Social Security Ruling 16-3p explicitly states the ALJ should assess the

30

consistency of a claimant's observations about her own symptoms with the claimant's other statements about her symptoms and the other record evidence. *See* SSR 16-3p, * 7.

Finally, Luna argues "the ALJ erred by discounting Plaintiff's statements regarding the severity of her conditions because she received 'conservative' treatment." (Doc. 12, at 10-11). According to Luna, her "disability is primarily related to her polyneuropathy," which surgery cannot reasonably treat, as physicians have not located a specific nerve enduring pressure that would result in the pain she experiences. (*Id.* at 11). However, the Eleventh Circuit has "held that '[t]he ALJ may consider the level or frequency of treatment when evaluating the severity of a claimant's condition." *Watkins v. Comm'r, Soc. Sec. Admin.*, No. 23-12765, 2025 WL 18514, at *15 (11th Cir. Jan. 2, 2025) (alteration in original) (citing *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015); *Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996)); *see also Morales v. Comm'r of Soc. Sec.*, 799 F. App'x 672, 676 (11th Cir. 2020) (citing *Wolfe*, 86 F.3d at 1078) ("A conservative treatment plan tends to negate a claim of disability."). Moreover, the ALJ did not find Luna disabled because she did not need surgery. Rather, she found Luna disabled because the record as a whole did not demonstrate Luna suffered impairments that rose to the alleged level, and the relatively conservative course of treatment she received constituted but one factor in that determination. That conclusion comports with applicable law and enjoys substantial evidentiary support. *See Estes v. Kijakazi*, No. 4:20-CV-852-RLW, 2022 WL 782299, at *6 (E.D. Mo. Mar. 15, 2022) (ALJ properly

considered claimant's conservative treatment in evaluating her complaints, including treatment of her polyneuropathy symptoms with prescribed medication); *Meehan v. Comm'r of Soc. Sec.*, No. 3:17-CV-178-J-PDB, 2018 WL 8578033, at \*3 (M.D. Fla. Sept. 25, 2018), *aff'd*, 776 F. App'x 599 (11th Cir. 2019) ("Meehan contends the ALJ erred by discounting Dr. Ngo-Seidel's opinions based on conservative treatment without pointing to any medical authority indicating she has a condition that would respond to more aggressive treatment or surgery. . . . She argues, 'The ALJ could not rely on his layman's understanding of [her] course of treatment given the state of the record.' . . . But she points to no authority requiring an ALJ to identify more aggressive treatment before relying on conservative treatment as a basis for rejecting opinions indicating complete disability.") (brackets in original).

Though the record contains evidence Luna's polyneuropathy and other conditions cause symptoms, the record as a whole does not undermine the substantial evidence supporting the ALJ's RFC finding. The court must assess not whether some evidence supports Luna's contentions that she experiences disabling limitations, but whether substantial evidence supports the ALJ's decision to find the opinions unpersuasive. *Moore*, 405 F.3d at 1213 (quoting *Bloodsworth,* 703 F.2d at 1239) ("To the extent that Moore points to other evidence which would undermine the ALJ's RFC determination, her contentions misinterpret the narrowly circumscribed nature of our appellate review, which precludes us from 're-weigh[ing] the evidence or substitut[ing] our judgment for that [of the Commissioner] . . . even if the evidence preponderates

against' the decision.") (alterations in original).  For all the reasons stated herein, it does.

In summary, taken as a whole, the medical and other record evidence provides substantial evidentiary support for the ALJ's RFC finding, and the ALJ applied proper legal standards.  Accordingly, the ALJ did not err in assessing Luna's complaints of subjective symptoms.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 29th day of August, 2025.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE